UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LANITA ROBINSON, as Guardian of
VANDEN ROBINSON, a Legally
Incapacitated Person,

      Plaintiff,

v.

      CASE NO. 2:09-CV-10341
      JUDGE VICTORIA A. ROBERTS
      MAGISTRATE JUDGE PAUL KOMIVES

ALLSTATE INSURANCE COMPANY,

      Defendant.
                         /

**REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (docket #68)**

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    B.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    C.    *Discussion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        1.    *The No-Fault Act Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    D.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

\*    \*    \*    \*    \*

I.    RECOMMENDATION: The Court should deny plaintiff's motion for partial summary judgment.

II.    REPORT:

A.    *Background*

Plaintiff Lanita Robinson, as guardian of Vanden Robinson, commenced this action against defendant Allstate Insurance Company on January 7, 2009, in the Oakland County Circuit Court. On January 29, 2009, defendant removed the action to this Court pursuant to 28 U.S.C. § 1441, based on the diverse citizenship of the parties. Plaintiff's complaint seeks payment for attendant

care services resulting from injuries sustained in an automobile accident pursuant to an automobile insurance police issued by defendant and Michigan's No-Fault Act, MICH. COMP. LAWS § 500.3107(1). The basic facts are not in dispute.

On April 15, 1997, plaintiff's ward, Vanden Robinson, was injured when he was struck as a pedestrian by a vehicle. Vanden, who was six years old at the time of the accident, was in a coma for one week, and remained hospitalized for over five weeks. Plaintiff alleges that Vanden continues to suffer from a cognitive impairment which requires attendant care, and will likely require such care for the rest of his life. Plaintiff filed a prior lawsuit in the Oakland County Circuit Court seeking recovery of attendant care expenses. That suit resulted in a settlement entered on June 18, 2003, in which defendant agreed to pay previously accrued attendant care benefits as well as future benefits at the rate of $350.00 per day for the period from June 18, 2003, through June 18, 2004. The parties also agreed that during this one year period, plaintiff would not be required to provide documentation in support of her claim. *See* Def.'s Br. in Resp. to Pl.'s Mot. for Summ. J., Ex. A [hereinafter "Def.'s Br."].

On March 23, 2006, defendant retained Dr. Manfred Greiffenstein to review Vanden's medical records and opine on his continuing need for attendant care services. Dr. Greiffenstein opined that Vanden, who was 15 years old at the time of the examination, was capable of performing activities of daily living, but required some monitoring and supervision. Dr. Greiffenstein also tentatively opined that Vanden would likely need supervision throughout his life, that it was doubtful Vanden would gain additional cognitive ability, but that he would likely gain additional impulse control with experience and age. *See* Pl.'s Br. in Supp. of Mot. for Summ. J., Ex. 1 [hereinafter "Pl.'s Br."].

Vanden was subsequently examined by Louis Dvorkin, Ph.D., a neuropsychologist. Dr. Dvorkin submitted a report dated May 16, 2007, opining that it is unlikely that Vanden will achieve major gains in his cognitive and intellectual capacity. He also opined that it could be anticipated that Vanden would need some amount of supervision and monitoring throughout his life, but with full adherence to his medication treatment regimen, living in a supported environment, and participation in mental health services, the nature and degree or supervision could likely be tapered downward as he gains survival skills and matures. Dr. Dvorkin also opined that Vanden was currently (as of the date of the report) in need of approximately 12 hours of attendant care on weekdays, and approximately 16-18 hours of such care on weekends when school was not in session. *See* Pl.'s Br., Ex. 2.

On August 14, 2007, Dr. Dvorkin submitted a supplemental report, responding to specific questions that had been asked by defendant. *See id.*, Ex. 3. In response to a question regarding the number of hours attendant care would be reasonable and necessary, Dr. Dvorkin indicated there are about 9-12 hours per day in which Vanden is in a relatively unstructured setting, and 16-18 such hours on the weekends. He noted that Vanden's unstructured time is spent on various activities which would not be likely to require direct supervision. More specifically, Dr. Dvorkin noted that Vanden does spend some periods of time where he is not supervised by an adult, such as when he goes to the mall with friends. Dr. Dvorkin explained that these periods involved typical teen activities, and that there had been no reported negative behavioral consequences. *See id.* at 1-2. Dr. Dvorkin opined that "[it would not be appropriate for the care giver to receive compensation for this time," and that Vanden's "representations of these events also raises questions of the need for 24/7 supervision and monitoring and/or the degree of responsibility being exercised or being maintained

3

by his adult caregivers in these situations." *Id*. at 2. Dr. Dvorkin noted that based on the medical records "the suggested number of hours of daily supervision or monitoring recommended ranged from a low of 8 hours per day up to 24 hours per day. Notably, there has been no medical professional who has disavowed this young man's need for some form and level of supervision or monitoring." *Id*. Sensing that the issue was not the need for some supervision but the specific number of hours that supervision or monitoring was actually being performed, Dr. Dvorkin suggested that it would be appropriate for defendant to "demand[] that his adult caregivers maintain a log of these hours with the associated documentation of what services are being offered during these times and by whom." *Id*.

In response to defendant's question as to whether any of Dr. Dvorkin's recommendations had changed based on the additional documentation provided to him, Dr. Dvorkin opined that "the new information provided offers no clear justifications to limit the amount of supervision recommended in my previous report." *Id*. at 5. He did, however, opine that steps should be taken to implement the actions set forth in his supplemental report, including an evaluation in the home setting, adherence to the prescribed medicine regimen, and continued treatment, because "these will assist us in making more informed and objective decisions as to the amount of supervision or monitoring that may be required." *See id*. Additionally, Dr. Dvorkin opined that "the adult caregivers should be required to specifically document what types of supervision are being offered, the exact amount of time involved in each, and who is providing these services." *Id*. Dr. Dvorkin added Vanden's indication to him "that he sleeps 6-8 hours on a typical night without any statement that he will awaken at night would negate the need for 24 hour supervision and monitoring." *Id*. Dr. Dvorkin concluded his report:

4

> Ultimately, it will likely prove to undermine the goals identified by his treaters of achieving the goals of autonomy and independence to provide 24/7 supervision and monitoring of Vanden by an adult on an indefinite basis. He will likely become even more oppositional and defiant under these circumstances. Without specific documentation of acting out behaviors, it then becomes difficult, if not impossible, to justify Vanden's need for 24/7 supervision. The unwarranted maintenance of 24/7 supervision and monitoring should be addressed, but can only be accomplished with the cooperation of his adult caregivers and the receipt of additional records. I would hope that all could work together in a cooperative and unified manner to accomplish the stated goals of promoting Vanden's autonomy and independence to the fullest extent possible.

*Id.* at 5-6.

On November 1, 2007, defendant's employee Judy Cenzer sent a letter to plaintiff's counsel requesting additional documentation in light of Dr. Dvorkin's supplemental report. The letter indicated that this information had previously been requested in a letter dated October 14, 2005, but had not been provided. *See id.*, Ex. 4, at 1. The letter further stated:

> This information is requested to support the current attendant care that is required. Review of the medical records do[es] not support or indicate any behavioral issues other than what the mother reports that occur in the home setting. The school records indicate that his attendance is good with no disciplinary problems noted. Medical records not[e] that Vanden is independent with all ADL's [activities of daily living] and does household chores with his brother. The records from Summer Pediatric Rehabilitation Program of 2005 states he has developed a higher maturity level, positively interacts with others, displays age-appropriate behavior, serves as a role model, and responds positively and respectfully to redirection.
> If Vanden is displaying behavioral inappropriateness then a behavioral modification program should be implemented.
> I am requesting th[at] the caregiver provide a detailed log of the above information to include what duties and responsibilities that they are performing and the amount of hours required to do so on weekdays and weekends and to specifically document the "out of control" behaviors effective 1-1-2008 for payment to be continued. I have several conflicting reports from his own treating physicians as well as Dr. Greiffenstein and Dr. Dvorkin to the amount of supervision necessary for Vanden and documentation would be helpful.

*Id.* It does not appear that plaintiff responded to this letter, and defendant ceased paying attendant care benefits on January 31, 2008.

5

Plaintiff commenced this action in January 2009. On July 21, 2009, Vanden was examined by Dr. Paul Cullis, M.D., a neurologist selected by defendant. Inexplicably, although Dr. Cullis's examination is referenced by both parties, his report is not attached to either party's brief. However, plaintiff represents that Dr. Cullis opined that plaintiff no longer suffers from the sequelae of his brain injury and that all of his problems are related to pre-accident concerns. Plaintiff was subsequently examined by W. John Baker, Ph.D., a neuropsychologist. After extensively reviewing Vanden's medical records and psychological testing, Dr. Baker diagnosed[1] Vanden as suffering cognitive impairment secondary to traumatic brain injury on Axis I, no personality disorders on Axis II, and a GAF score of 60. *See* Pl.'s Br., Ex. 5, at 35-36. Dr. Baker rejected Dr. Cullis's conclusion regarding the source of Vanden's continued problems being solely pre-accident concerns. Dr. Baker suggested several recommendations for further treatment. With respect to the attendant care issue, Dr. Baker opined:

---

[1] Vanden was diagnosed in accordance with the diagnostic protocol for mental disorders as set forth in the American Psychiatric Associations's DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. rev. 2000) ("DSM-IV-TR"). Under the DSM-IV approach, disorders are grouped into categories and sub-categories, *e.g.*, anxiety disorders, sleep disorders, personality disorders, etc., and a patient is diagnosed along five separate axes. Axis I diagnoses clinical disorders such as mood disorders, sleeping disorders, etc. Axis II is used to diagnose personality disorders and mental retardation. Axis I and II disorders are further classified as mild, moderate, or severe. Axis III is used for reporting general medical conditions which are relevant to understanding or treating the patient's mental disorder. Axis IV is used for reporting psychosocial and environmental problems that may be relevant to understanding or treating the patient's mental disorder. Finally, Axis V is used to report the clinician's judgment of the individual's overall level of functioning using the Global Assessment of Functioning (GAF) Scale. Under the GAF Scale, the clinician considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness on a scale of 1 to 100. At the 51-60 point range, a patient has "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)," while in the 61-70 point range a patient exhibits "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *See* DSM-IV-TR, at 2-35.

> Adult supervision or supervision by a responsible person is recommended. Twenty-four hour attendant care is not necessary; however, daily care or supervision for six to eight hours would seem reasonable. Guardianship is not recommended, though conservatorship may be appropriate.

*Id.* at 37.

Vanden was also examined on October 24, 2009, by Kertia Black, M.D. Dr. Black appeared to agree with Dr. Baker in rejecting Dr. Cullis's conclusion, *see* Pl.'s Br., Ex. 6, at 9-10, but also diagnosed Vanden as suffering both from traumatic brain injury and from premorbid mild mental retardation. *See id.* at 11. With respect to the attendant care issue, Dr. Black opined:

> I am not convinced that the patient needs 24-hour supervision. After all, he is able to independently perform his basic activities of daily living. But I do believe there is some need for supervision because he still has difficulty controlling his temper and there are concerns about his potential for violent behavior towards his siblings when he is not being supervised. I would recommend that when he is not at Unique Options and is not asleep, he have supervision. . . . If we subtract the number of hours that he is at Unique Options and eight hours of sleep from the supervision requirements, that would be eight hours a day on weekdays and on weekends up to 16-hours per day.

*Id.* at 12.

Plaintiff filed this motion for partial summary judgment on September 8, 2010. Plaintiff seeks partial summary judgment on the issue of allowable attendant care expenses during the time period February 1, 2008 (when defendant stopped paying benefits) through July 21, 2009 (the date Dr. Cullis submitted his report. Plaintiff argues that there is no genuine issue of material fact that Vanden's condition or his need for attendant care services did not change in the relevant time period, or that defendant never required any documentation before paying benefits in light of Vanden's condition prior to January 31, 2008. Plaintiff also contends that defendant is subject to the penalty interest provision of the No-Fault Act because it failed to pay benefits within 30 days, and that she is entitled to attorney fees because defendant's failure to pay benefits was unreasonable. Plaintiff

7

contends that defendant was liable for benefits at a minium of $350.00 per day during the relevant time period, and thus seeks entry of judgment "in the minimal amount of $187,950.00" for the period from February 1, 2008, through July 21, 2009. Plaintiff also seeks a judgment declaring that defendant is liable for penalty interest and attorney fees. Defendant filed a response on November 1, 2010. Defendant argues that plaintiff has failed to provide reasonable proof of her loss as required by the No-Fault Act. Plaintiff filed a reply on November 8, 2010.

B. *Legal Standard*

Under Rule 56, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick*, 355 F.3d at 451-52 (citing *Anderson*, 477 U.S. at 248). In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-movant as well as draw all reasonable inferences in the non-movant's favor. *See Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

"The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." *Hedrick*, 355 F.3d at 451 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). To meet this burden, the moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the

burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also*, FED. R. CIV. P. 56(e).

To create a genuine issue of material fact, however, the non-movant must do more than present some evidence on a disputed issue. As the Supreme Court has explained, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Thus, "[t]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland*, 344 F.3d at 613.

As will be discussed more fully below, plaintiff bears the burden of proof on her claim for no-fault benefits. In such a case, where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense." *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1335 (D. Colo. 1997); *see also*, *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir.

1991); *Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992).[2] In other words, in such a case the movant "must satisfy both the initial burden of production on the summary judgment motion–by showing that no genuine dispute exists as to any material fact–and the ultimate burden of persuasion on the claim–by showing that it would be entitled to a directed verdict at trial." William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477-78 (1991). "Once a moving party with the burden of proof makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003).

C.  *Discussion*

   1.  *The No-Fault Act Generally*

Plaintiff asserts a single cause of action for benefits under an insurance contract pursuant to the Michigan No-Fault Act. "To assert a no-fault claim, an insured must demonstrate that the insured is entitled to benefits 'for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle' without regard to fault, and that the insurer is obligated under an insurance contract to pay those benefits, but failed to do so timely." *Cooper v. Auto Club Ins. Ass'n*, 481 Mich. 399, 407, 751 N.W.2d 443, 448 (2008) (quoting MICH. COMP. LAWS § 500.3105). Once an insured establishes these elements, benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary

---

[2]*See also International Ass'n of Heat and Frost Insulators and Asbestos Workers Local Union 42 v. Absolute Environmental Services, Inc.*, 814 F.Supp. 392, 401 (D. Del. 1993) ("When the moving party seeks summary judgment based on a claim or defense upon which the moving party bears the ultimate burden of proof at trial, the moving party must establish every element of that claim or defense as a matter of law such that no reasonable jury could return a verdict for the nonmovant.").

products, services and accommodations for an injured person's care, recovery, or rehabilitation," three years of work loss with a monthly cap, expenses reasonably incurred in obtaining ordinary and necessary replacement services for a three-year period with a daily cap, and for survivor loss. *See* MICH. COMP. LAWS §§ 500.3107, .3108. Under the Act, a personal protection insurance (PIP) claimant is entitled to "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." MICH. COMP. LAWS § 500.3107(1)(a).

"In order for a no-fault insurer to be responsible for a particular expense, three requirements must be satisfied: (1) the expense must have been incurred by the insured, (2) the expense must have been for a product, service, or accommodation reasonably necessary for the injured person's care, recovery, or rehabilitation, and (3) the amount of the expense must have been reasonable." *Hamilton v. AAA Michigan*, 248 Mich. App. 535, 543, 639 N.W.2d 837, 842 (2001); *see also*, *Nasser v. Auto Club Ins. Ass'n*, 435 Mich. 33, 50, 457 N.W.2d 637, 645 (1990). The plaintiff bears the burden of proof on each of these elements. *See Williams v. AAA Michigan*, 250 Mich. App. 249, 258, 646 N.W.2d 476, 480 (2002). Thus, "[w]here a plaintiff is unable to show that a particular, reasonable expense has been incurred for a reasonably necessary product and service, there can be no finding of a breach of the insurer's duty to pay that expense, and thus no finding of liability with regard to that expense." *Nasser*, 435 Mich. at 50, 457 N.W.2d at 645. Further, "whether PIP expenses are reasonable and necessary is generally considered a question of fact for the jury." *Rose v. State Farm Mut. Automobile Ins. Co.*, 274 Mich. App. 291, 296, 732 N.W.2d 160, 163 (2006) (citing *Nasser*, 435 Mich. at 55, 457 N.W.2d at 647); *Bonkowski v. Allstate Ins. Co.*, 281 Mich. App. 154, 169, 761 N.W.2d 784, 794 (2008) (citation omitted). Further, as the Michigan Court of

11

Appeals has explained,

> [i]n determining reasonable compensation for an unlicensed person who provides health care services, a fact-finder may consider the compensation paid to licensed health care professionals who provide similar services. For this reason, consideration of the compensation paid by health care agencies to their licensed health care employees for rendering services similar to the services provided by unlicensed family members is appropriate when determining reasonable compensation for those family members.

*Bonkowski*, 281 Mich. App. at 164-65, 761 N.W.2d at 791 (citation omitted). Further, how an insurer goes about calculating whether a particular expense is reasonable is relevant in an action to recover benefits. *Cf. Advocacy Organization for Patients & Providers v. Auto Club Ins. Ass'n*, 257 Mich. App. 365, 379-82, 670 N.W.2d 569, 577-79 (2003) (discussing insurer's initial obligation to determine reasonable rate and how insurer in that case established such a rate), *aff'd*, 472 Mich. 91, 693 N.W.2d 358 (2005).

Under the Act, "[p]ersonal protection insurance benefits are overdue if not paid within 30 days after an insurer receives reasonable proof of the fact and of the amount of loss sustained." MICH. COMP. LAWS § 500.3142(2). Any overdue payments are subject to statutory interest of 12% per annum. *See id*. § 500.3142(3). If the insured establishes that she provided reasonable proof of loss and that the insurance company failed to pay the claim within 30 days, statutory interest must be awarded; an insurance company's good faith is irrelevant. *See Williams*, 250 Mich. App. at 265, 646 N.W.2d at 483; *Davis v. Citizens Ins. Co. of Am.*, 195 Mich. App. 323, 329, 489 N.W.2d 211, 217 (1992). However, if the insured establishes both that payment is overdue and that the insurance company unreasonably refused to pay the claim or unreasonably delayed payment, the court may also award attorney fees. *See Davis*, 195 Mich. App. at 329, 489 N.W.2d at 217; MICH. COMP. LAWS § 500.3148(1).

Although there is no Michigan case law defining "reasonable proof of loss" as used in § 500.3142, "[t]he standards and criteria used to determine whether a proof of loss is 'satisfactory' is a long-standing issue in insurance," *ACME Roll Forming Co. v. Home Ins. Co.*, 31 Fed. Appx. 866, 872 (6th Cir. 2002), and is general governed by an objective standard focusing on whether a neutral observer would find the proof of loss adequate. *See id.* Further, § 500.3142 is based on § 23 of the Uniform Motor Vehicle Accident Reparations Act (UMVARA), and where provisions of the UMVARA have been adopted it is presumed that the Michigan legislature was "cognizant of, and in agreement with, the policies which underlie the model act's language." *Ross v. Auto Club Group*, 481 Mich. 1, 24, 748 N.W.2d 552, 564 (2008) (internal quotation omitted). And other jurisdictions that have adopted the UMVARA apply an objective standard to the question of proof of loss, requiring only such proof as reasonably would put the insurer on notice of the basis of the claim and the need to investigate further. *See, e.g.*, *Jowers v. Nationwide Ins. Co.*, 832 F.2d 1246, 1251 (11th Cir. 1987) (applying Georgia law); *Bassie v. American Standard Ins. Co. of Wis.*, 661 P.2d 812, 817-18 (Kan. App. 1983). *See generally*, *Heritage Resources, Inc. v. Caterpillar Fin. Servs. Corp.*, 284 Mich. App. 617, 632, 774 N.W.2d 332, 340 (2009) ("When interpreting a uniform act . . . it is appropriate for this Court to look for guidance in the caselaw of other jurisdictions in which the act has been adopted.").

    2.    *Analysis*

After applying these principles in light of plaintiff's burden on summary judgment, the Court should conclude that genuine issues of material fact remain which preclude summary judgment in plaintiff's favor. Specifically, there remain genuine issues of material fact with respect to whether the expenses sought were both reasonably and actually incurred.

With respect to reasonableness, the record does not support plaintiff's assertion that Vanden's condition has remained unchanged through the time of Dr. Cullis's report in July 2009, much less does it affirmatively demonstrate her entitlement to relief. Indeed, although it appears that some of plaintiff's treating physicians may have opined that 24 hour care was needed, each of the medical reports submitted by plaintiff in connection with his motion disclaim such a need. *See* Pl.'s Br., Ex. 1, at 18 (Dr. Greiffenstein) ("He does not require 24 hours of care even when viewing the records in a light most favorable to Mr. Robinson:" "I estimate that he needs about 8 hours total a day when not in another supervised setting (such as school). Twenty-four hours of care a day as recommended by Dr. Shiner is unsupportable and indefensible."); Ex. 2, at 13 (Dr. Dvorkin) (based on Vanden's schedule at school and sleep, "it would appear that there are approximately 12 hours or so that some level of supervision or monitoring is warranted during the weekdays" and 16-18 hours on weekends); Ex. 3, at 1 (Dr. Dvorkin) (same); Ex. 5, at 37 (Dr. Baker) ("Twenty-four hour attendant care is not necessary; however, daily care or supervision for six to eight hours would seem reasonable."); Ex. 6, at (Dr. Black) ("I am not convinced that the patient needs 24-hour supervision. . . . If we subtract the number of hours that he is at Unique Options and eight hours of sleep from the supervision requirements, that would be eight hours a day on weekdays and on weekends up to 16-hours per day.").

Thus, there remains a factual question as to how many hours per day attendant care services are reasonably necessary. This, in turn, provides a factual question on the level of compensation. Plaintiff contends that she is minimally entitled to benefits of $350.00 per day, based on the prior payments made by defendant at this rate. However, the record does not establish upon what this amount was based, and it appears it was based on the assumption of 24 hour care. If, in fact, such

14

a level of care is not reasonably necessary, it may follow that a rate of $350.00 per day is not reasonable compensation. As explained above, these are quintessentially jury questions, and "whether the plaintiff . . . [is] entitled to collect the value of the services [under the no-fault act] and the determination of the value are matters properly left for the jury to decide." *Booth v. Auto-Owners Ins. Co.*, 224 Mich. App 724, 730, 569 NW2d 903, 905 (1997). This is particularly so in light of the fact that plaintiff, as the party both seeking summary judgment and bearing the burden of proof at trial, must affirmatively establish her entitlement to judgment as a matter of law. *See Healthcall of Detroit, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 05-cv-74434, 2008 WL 2622955, at *4 (E.D. Mich. July 3, 2008) (Whalen, M.J.).

Further, there remains a factual question as to whether, or to what extent, Vanden actually incurred the attendant care expenses. Although plaintiff bears the burden of proof on this issue as well, her motion points to no evidence supporting her claim that she provided the entirety of the attendant care services for which she is seeking recovery. Her motion does not include any of the logs kept of her hours performing attendant care services, an affidavit attesting to those hours, or her deposition testimony establishing those hours. Attached to plaintiff's complaint are calendars which simply list a number of hours attendant care was provided each day, mostly asserting that it was 24 hours of care. These are insufficient to affirmatively establish plaintiff's entitlement to relief, in light of the discrepancies between these calenders and the medical reports, which suggest that there are many hours in the day when Vanden is not provided attendant care services by plaintiff. *See Healthcall of Detroit*, 2008 WL 2622955, at *3 ("I disagree that Plaintiff can show presently that there is no question of material fact as to whether the charges in dispute were incurred. The services in question cannot [be] found to have been 'incurred' merely by submission of claims to

15

defendant."). Further although defendant has included transcripts of plaintiff's two depositions, plaintiff's testimony does not show that she is entitled to relief as a matter of law because that testimony does not establish that she provided 24 hour attendant care to Vanden. Because plaintiff has failed to provide evidence of the actual number of hours per day that she provides attendant care services, she has failed to satisfy her summary judgment burden of pointing to an absence of a genuine issue of material fact which affirmatively entitles her to relief.

This conclusion is not altered by plaintiff's reliance on *Morris v. Detroit Bd. of Educ.*, 243 Mich. App. 189, 622 N.W.2d 66 (2000) (per curiam). In that case, the court considered a claim for nursing care benefits under the worker's compensation statute. The court rejected the Worker's Compensation Appellate Commission's (WCAC) application of a "stop-watch" method to calculate nursing care benefits. Under this rule, the WCAC "would only award nursing benefits for the precise time a spouse or family member spends [performing nursing tasks contemplated by the statute], at least in a case in which it concluded that the injured worker required less than twenty-four hours of care each day." *Morris*, 243 Mich. App. at 193, 622 N.W.2d at 68. The court rejected this approach in the case of a spouse providing nursing care where the spouse was "on call" to provide care. The court explained that prior decisions "recognized that being available to give care, especially when the need for care can arise suddenly and unpredictably, is compensable when it is necessary." *Id*. at 196, 622 N.W.2d at 69. Here, however, defendants do not contends that plaintiff is not entitled to recover for times in which she is "on call" to provide sudden and unpredictable care. Rather, defendant's contention, which is supported by the medical evidence in the record, is that there are large portions of the day in which Vanden requires *no* family provided attendant care, either because he is in a controlled environment such as school or is sleeping, because Vanden's

16

condition does require the type of "on-call" attendant care at issue in *Morris* during these times. *Morris* itself makes this distinction. *See id.* at 197-98, 622 N.W.2d at 70 ("Surely we can see the possibility that, over time or because of specific events like surgery, an injured worker may need more or less on-call attendant care during certain times. Whether this care is compensable depends solely on whether it was necessary."); *id.* at 199, 622 N.W.2d at 70-71 ("On remand, the WCAC is still free to conclude that Charles Reagan only *needed* part-time care and, therefore, Florence Reagan was only entitled to compensation for the part-time care she rendered, whether performing actual services or being on-call."). And on this issue, as explained above, there remain genuine issues of material fact. Thus, even if the rule of *Morris* is applicable to attendant care expenses under the No-Fault Act, it is inapposite here. *See Whited v. Motorists Mut. Ins. Co.*, No. 08-10653, 2010 WL 3862717, at *32-*33 (E.D. Mich. Sept. 28, 2010) (Roberts, J.).

Nor is the conclusion of the foregoing analysis altered by plaintiff's reliance on defendant's previous payment of attendant care services and the Michigan Supreme Court's decision in *Manley v. Detroit Automobile Inter-Insurance Exchange*, 425 Mich. 140, 388 N.W.2d 216 (1986). Nothing in the No-Fault Act provides that a particular benefit, once paid, is forever irrevocable in light of changed circumstances or new information, and *Manley* does not suggest such a rule. In *Manley*, the insurer argued that "because the no-fault act requires a no-fault insurer only to reimburse an injured person for necessary allowable expenses actually incurred, the trial judge erred in entering a declaratory judgment establishing amounts payable in the future before the expense was actually incurred." *Manley*, 425 Mich. at 157, 388 N.W.2d at 223 (footnote omitted). The court rejected this argument, explaining that "[w]hile a no-fault insurer is required to pay only necessary and allowable expenses actually incurred, it does not follow that *when a dispute arises* a trial court is precluded

17

from entering a declaratory judgment determining" liability for future expenses. *Id.* (emphasis added). The court explained that "[t]he tendency of this contention is that [an insurer] may *relitigate* factual and legal issues that have already been decided when the [insured] seek[s] payment for expenses incurred after the date of the trial," a contention that the court found was "neither a workable nor a sound rule of law." *Id.* Such issues, the court held, "may not be *relitigated* absent a change in law . . . or a substantial change in the facts or circumstances." *Id.* at 160, 388 N.W.2d at 225 (emphasis added).

As the language used by the *Manley* court makes clear, that case was about a trial court's power to enter a declaratory judgment for future expenses, and the circumstances in which a party may relitigate the trial court's determination. Nothing in that decision purports to establish an estoppel rule preventing an insurer from challenging the future necessity or reasonableness of an expense it has previously paid. Here, defendant does not seek to relitigate issues determined in a prior action. Although plaintiff filed a previous suit to recover attendant care expenses, that suit resulted in a compromise agreement, which by its terms only obligated defendant to provide attendant care benefits from June 18, 2003, through June 18, 2004, without further documentation of the attendant care actually provided. Here, in short, there is no prior declaratory judgment which defendant seeks to relitigate, and thus *Manley* is inapplicable. *Cf. Ganun v. State Farm Mut. Auto. Ins. Co.*, No. 09-12966, 2011 WL 1869429, at *3 (E.D. Mich. May 16, 2011) (Roberts, J.) (describing *Manley* as a collateral estoppel rule preventing relitigation of questions decided in a prior suit).

Finally, because there remain genuine issues of material fact with respect to defendant's liability under § 500.3107, it necessarily follows that plaintiff is not entitled to summary judgment

on his claims for penalty interest and attorney fees. *See Williams*, 250 Mich. App. at 265, 646 N.W.2d at 483 (emphasis added) ("Penalty interest must be assessed against a no-fault insurer if the insurer refused to pay benefits and *is later determined to be liable* . . . ."). Further, this makes it unnecessary at this time for the Court to wade into the parties' dispute concerning whether plaintiff provided "reasonable proof of loss" to defendant. Whether the claimant submitted "reasonable proof of loss" is relevant to determining a claimant's entitlement to statutory interest under § 500.3142, but is neither an element nor a defense to liability under § 500.3107. Under that section, as explained above, the only questions are whether the expenses sought were reasonable, necessary, and actually incurred.

D.  *Conclusion*

In view of the foregoing, the Court should conclude that plaintiff has failed to meet her burden of demonstrating an absence of issues of material fact which affirmatively demonstrate her entitlement to relief. Accordingly, the Court should deny plaintiff's motion for partial summary judgment.

III.  <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931

F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: 6/30/11

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

---

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on June 30, 2011.

s/Eddrey Butts
Case Manager

---